[Civ. No. 2433. Fifth Dist. June 16, 1976.]

FRANK W. SUBRIAR et al., Plaintiffs and Respondents, v.
CITY OF BAKERSFIELD, Defendants and Appellants.

**COUNSEL**

Kenneth W. Hoagland, City Attorney, and Richard J. Oberholzer, Deputy City Attorney, for Defendants and Appellants.

Sims & Solomon and Gabriel W. Solomon for Plaintiffs and Respondents.

**OPINION**

**CARKEET, J.\***—This case arose out of the respondent Subriar's operating an ambulance business in the City of Bakersfield without first having obtained a certificate of convenience and necessity as required by chapter 7.62 of the Bakersfield Municipal Code. Respondent Subriar on two different occasions filed applications for obtaining a certificate. At the time of respondent's first application there was only one ambulance operator in the city. But upon the filing of each application, the respondent, Subriar, refused to provide *any* information to show that public convenience and necessity required the issuance of a certificate or license to another ambulance operator in the city.

Between respondent's first and second applications, another ambulance operator (Hall Ambulance) made application and provided information to show that public convenience and necessity required another operator. A certificate was then issued to Hall Ambulance.

Respondent Subriar filed a first amended complaint in Superior Court of Kern County on August 3, 1973, essentially seeking to have the court declare the "convenience and necessity" clause as invalid and in

---

\*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

violation of the United States Constitution and the state Constitution. Respondent Solomon, the attorney for Mr. Subriar, joined himself as a taxpayer party under Code of Civil Procedure section 526a.

Trial was held in the Superior Court of Kern County on December 21, 1973. At the conclusion of the plaintiffs' case, defendants made motions for judgment on the pleadings and motion for judgment. On February 11, 1974, order re judgment (intended decision) was issued by the superior court. Appellants filed objections and proposed counter findings of fact and request for special findings in a timely manner. On April 26, 1974, the trial court signed findings of fact and conclusions of law and on April 29, 1974, entered its judgment. Appellants made a timely motion for new trial which was denied and appellants filed a notice of appeal.

In this appeal appellants (defendants) attack a judgment of the Superior Court of Kern County which adjudged unconstitutional the ordinance of the City of Bakersfield regulating the granting of permits to operate ambulances within the city limits,[1] and granted a permanent injunction against the enforcement of said ordinance.

As filed, the action embraced two separate causes of action: the first, a cause of action by plaintiff Frank Subriar, the operator of an ambulance service in the County of Kern, who alleged he was denied a permit to operate his ambulance within the City of Bakersfield upon unconstitutional grounds; the second, a cause of action by plaintiff Gabriel W. Solomon (Subriar's attorney of record herein) in his individual capacity

---

[1]On November 13, 1961, by Ordinance No. 1391 (New Series) the City Council of the City of Bakersfield adopted "An Ordinance Adding Chapter 7.62 to the Municipal Code of the City of Bakersfield Regulating the Use and Operation of Ambulances" which provided in part as follows:

"Section 7.62.020. *Certificate of Public Convenience and Necessity Required.* No person shall engage in the ambulance business without first obtaining a certificate of public convenience and necessity as hereinafter provided from the City Manager or the City Council and this certificate shall be in addition to any business license required by Chapter 6.20 of the Municipal Code of the City of Bakersfield.

". . . . . . . . . . . . . . . . . .

"Section 7.62.060. *Issuance of Certificate.* The City Manager shall not issue a permit hereunder unless he finds:

"(a) That the applicant is financially responsible,

"(b) That the applicant is of good moral character or that the officers of applicant are of good moral character.

". . . . . . . . . . . . . . . . . .

"(f) That the public convenience and necessity require the operation of such private ambulance business within the limits of the City of Bakersfield."

as a citizen and taxpayer under Code of Civil Procedure section 526a, attacking the constitutionality of the same municipal statute.[2]

Certain basic facts were stipulated to by respondents (plaintiffs) and the stipulations accepted by appellants. These stipulations eliminate the necessity of a discussion by this court of a considerable quantity of evidence received by the court, especially with respect to the constitutional questions involved.

It is stipulated as a fact "that the ambulance business is vitally affected with the public interest. It is a business which not only the city and state have a right and police power right to reasonably regulate it but indeed would be remiss in their duties if they did not strictly and severely and closely regulate it."

It was further stipulated as follows: "November 13, 1961, which was the adoption date of Chapter 7.62 of the City Ordinance, that prior to that time, there were no laws nor regulations in effect which specifically regulated the conduct of ambulance service as such within the City of Bakersfield; that in this wholly unregulated pre-1961 atmosphere, ambulance services available to city residents were often unsafe, unsanitary and otherwise inadequate. The ability of responsible ambulance service operators to operate safe, sanitary, dependable and otherwise adequate ambulance service was unfairly impaired by unprincipled, irresponsible and wholly unregulated competitors. Accordingly, it was apparent that a need existed for enactment of a regulatory ordinance and accordingly, on November 13, 1961, the City enacted an ambulance industry ordinance known as Chapter 7.62 and as to each and every proviso thereof, the plaintiff stipulates that with the sole exception of subsection (f) of 7.62.050 [sic]—that's the public necessity provision— that with the sole exception of that proviso, the plaintiff stipulates that all other provisions of the ordinance were fully valid, were within the police power of the City and indeed were fully justified by compelling public interest and necessity." (The stipulation was phrased by respondents and was accepted by appellants.)

[2]Section 526a of the Code of Civil Procedure provides in part: "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, . . . funds, or other property of a county . . . may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, . . . by a citizen resident therein, . . . who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax therein."

It will thus be seen that the constitutional issue is narrowed down to whether subdivision (f) of section 7.62.060, the public convenience and necessity requirement, is unconstitutional and invalid.

It was also stipulated that plaintiff Solomon was a member of the Bakersfield City Council when the ordinance was enacted in 1961.

Following the enactment of the 1961 ordinance James Frederick Flinn, an ambulance owner-operator since 1955 made application to the city under the ordinance, and received from the City of Bakersfield a certificate of convenience and necessity and has ever since that date operated an ambulance service in the city. He maintains four ambulances available for service, two of them on full-time operation and two of them "standby" vehicles.

In July 1971, a certificate of convenience and necessity was granted by the City of Bakersfield under the ordinance to Harvey Lewis Hall, who has since operated an ambulance service in the city. He also maintains four ambulances available for the ambulance service in the city.

In 1970 respondent Subriar filed an application for a certificate of public convenience and necessity to operate an ambulance within the City of Bakersfield. A hearing was held on Tuesday, June 23, 1970, at which hearing Subriar took the position that he need not make a showing of public convenience and necessity. On July 3, 1970, the City Manager of Bakersfield wrote him advising him that since his position at the hearing was that he need not make such showing, the hearing was terminated on all issues without further consideration.[3] No appeal to the

---

[3]Plaintiff's Exhibit 4, a letter of July 3, 1970, from H. E. Bergen, City Manager of Bakersfield, to Subriar, read in part as follows:

"In accordance with your request for a Certificate of Public Convenience and Necessity to operate an ambulance within the City of Bakersfield, a hearing was held on Tuesday, June 23, 1970.

"Chapter 7.62.060 of the Municipal Code requires that the City Manager issue a permit if he finds:

"a. The applicant is financially responsible

"b. The applicant is of good moral character

"c. The applicant has satisfied requirements of this Chapter and complied with all State laws

"d. Insurance policy has been procured

"e. Each private ambulance is adequate and safe for the purpose for which it is to be used and not more than five years old

"f. 'That the public convenience and necessity require the operation of such ambulance within the limits of the City of Bakersfield.'

"However, at the hearing your position was that you need not make a showing of Public Convenience and Necessity. Therefore, the hearing was terminated on all issues without further consideration."

city council was taken by Subriar.[4]

While the record is sketchy,[5] certain allegations of the complaint which were admitted by the answer indicate that apparently in late 1972 Subriar again made application to the city manager for a certificate of public convenience and necessity to operate an ambulance service in the City of Bakersfield and that a hearing was held and adjourned to a later date in January 1973, but the adjourned hearing was never held because Subriar's attorney, Mr. Solomon, wrote the city manager indicating that neither he nor Mr. Subriar would attend and requesting that the hearing be cancelled. The city manager treated this as a voluntary abandonment of the application and cancelled the hearing.[6] No appeal was taken by Subriar to the city council under section 7.62.170 of the ordinance.

Appellants made a motion for judgment on the pleadings at the conclusion of plaintiffs' case, and also made a motion for judgment on the state of the record. Both were denied. As to plaintiff Subriar, defendants' motions for judgment were grounded on the claim that the court had no jurisdiction to hear Subriar's complaint because he had failed to exhaust his administrative remedies and both his pleadings and his evidence showed such noncompliance with that well-established principle of law. However, such requirement of exhaustion of administrative remedies was found unnecessary by the trial court.

In view of the stipulations entered into, respondent Subriar's sole attack on the ordinance is that subdivision (f) of section 7.62.060 is unconstitutional because it provides no standards or criteria for the city to follow in determining when "public convenience and necessity" would allow the granting of a permit. Respondent further argues that by allowing the present permit holders to increase the number of ambu-

[4]Section 7.62.170 of the licensing ordinance provides that all refusals or denials of certificates of public convenience and necessity shall be subject to review by the city council. "For this purpose any person aggrieved by a decision of the City Manager or the Chief of Police may apply to the City Council for a hearing within fifteen (15) days after receipt of notice of such decision."

[5]The official minutes of the trial court for the trial on December 21, 1973, as reflected in the clerk's transcript, page 31, do not show that the letters of 1/10/73 and 1/16/73 referred to in the complaint were received in evidence, but the official court reporter's transcript, page 54, lines 7 through 16, indicates both letters were received in evidence.

[6]Solomon's letter of 1/10/73 to the city manager stated, among other things: "Neither Mr. Subriar nor I will attend the scheduled continued hearing and we request that the same be cancelled." City Manager Bergen's reply of 1/16/73 stated in part: "At your request, the continued hearing is cancelled. We will consider this a voluntary abandonment of the application."

lances they operate, whenever the need arises, the council can effectively exclude other applicants by finding negatively on public convenience and necessity, thereby in effect granting an exclusive right to operate ambulances to the two present permit holders.

An identical attack on the ordinance is made by respondent Solomon, in his capacity as a taxpayer under his cause of action brought under section 526a of the Code of Civil Procedure.

It was the position at trial of respondents that they had a *fundamental right* as citizens to engage in the business of operating an ambulance service in the City of Bakersfield, and since it was a fundamental right that was being interfered with the strict scrutiny test applied. Under the strict scrutiny standard the burden of establishing the validity of the ordinance is placed upon the city. Under the strict standard rule the city bears the burden of establishing not only that it has a compelling interest which justifies the ordinance, but that the requirements of the ordinance are necessary to further its purpose.

This is apparently the theory upon which the trial court tried the case, since respondents produced no evidence to show the claimed unconstitutionality of subdivision (f) of section 7.62.060, and the court placed the burden on appellants to prove the validity of their ordinance.

Nowhere in the pleadings, and at no time during the trial, was mention made of any claim by either plaintiff (respondent) that the license was in fact a franchise and amounted to a franchise which had been granted in violation of the provisions of the city's charter. However, respondent Solomon had apparently prepared an extensive brief on that point and kept it "under wraps" during the entire trial (with frequent, pointed courtroom references to the fact that he had an exhaustive brief on a novel point he did not wish to disclose until the trial was over). Upon completion of the trial and as a part of his written presentation respondent Solomon then filed his memorandum on that point.

The trial court ordered respondents to prepare findings and when these were prepared, proposed finding No. 1 was a finding that, "The allegations contained in paragraphs 1, 2, 4, 5, 6, 7, 8, 9, 10, 11 and 12 of the first cause of action of the first amended complaint herein are true." Finding No. 2 was a similar finding as to the allegations of paragraphs 1, 2, 3 and 4 of the second cause of action in the first amended complaint. Appellants filed timely objections to such proposed findings upon the

grounds that they were in a form prohibited by the Rules of Court (Rules for Superior Court, rule 232(e).)[7]

Notwithstanding appellants' objections, the trial court did on April 26, 1974, sign and file findings of fact and conclusions of law and a judgment based thereon. Findings Nos. 1 and 2 are in the form originally submitted and objected to by appellants, and violate rule 232(e).

The remaining findings are as follows:

"3. A certificate to operate an ambulance service within the City has *twice been denied* plaintiff, Frank Subriar, *by reason of defendant City's conclusion that the ambulance service needs of City residents were being adequately served* by the two existing operators certificated pursuant to Chapter 7.62 of the defendant City's Ordinance.

"4. Unless enjoined and restrained by this Court, defendant City would *indefinitely in the future continue to refuse* to certificate any other persons under said Chapter 7.62 so long as defendant City believes that the ambulance service needs of its residents are being adequately fulfilled by existing certificated ambulance operators regardless of the fact that any other applicant for such certificate might otherwise fulfill all of the other requirements of said Chapter 7.62 excepting only subsection (f) of 7.62.060.

"5. It would be an *entirely futile act and a complete waste of time* and effort for plaintiff Frank Subriar to submit yet a third application to the City prior to rendition of any decision upon his challenge to the constitutionality of subsection (f) of said Chapter 7.62.060.

"6. Said Chapter 7.62 does not in any degree or manner vest any power in the defendant City to limit the number of ambulances which existing certificated owners may operate.

"7. Said Chapter 7.62 leaves the two existing operators entirely free to engage in unlimited competition.

---

[7]California Rules of Court, Rules for Superior Courts, rule 232(e) provides: "Findings shall fairly disclose the court's determination of all issues of fact material to the judgment in the case and shall be concisely and chronologically stated whenever practicable. *Findings shall not refer merely to the truth or falsity of allegations contained in the pleadings.*" (Italics added.)

"8. Subsection (f) of said Chapter 7.62.060 as thus interpreted and enforced by defendant City, *arbitrarily* and *capriciously* deprives plaintiff Frank Subriar of his *fundamental right* to engage in the entirely lawful and publically [*sic*] useful business of conducting an ambulance service within defendant City.

"9. No evidence has been adduced to establish in any degree that the public's interest in safe, efficient, economical and otherwise adequate ambulance services is protected, promoted or served by said subsection (f) of Chapter 7.62.060.

"10. The phrase 'public convenience and necessity' as used in subsection (f) of Chapter 7.62.060 is vague and uncertain at least in that its purported meaning is not determined nor established in any raionale [*sic*] manner by an expertly equipped public utilities type body of defendant City." (Italics added.)

From the foregoing findings of fact the trial court drew the following conclusions of law:

"1. Plaintiff Frank Subriar insofar as required by law, has exhausted such administrative remedies as have *been pragmatically available to him* and plaintiff Gabriel W. Solomon as a taxpayer and resident of defendant City has standing to contest the validity of defendant's ambulance ordinance found in Chapter 7.62.

"2. Subsection (f) of said Chapter 7.62.060 *as interpreted and enforced by defendant City* is arbitrary, capricious and violative of both Federal and State Constitutional guarantees of due process and said subsection is therefore unconstitutional and void.

"3. Subsection (f) of said Chapter 7.62.060 as *interpreted and enforced by defendant City* vests a franchise in existing certificated ambulance operators in violation of the Charter of defendant City and said subsection is therefore void and illegal.

"4. Subsection (f) of said Chapter 7.62.060 is so uncertain and vague as to deprive plaintiff Frank Subriar of the right he would otherwise have to conduct a lawful business and said subsection is therefore unconstitutional and void." (Italics added.)

Appellants filed a motion for new trial upon the grounds of: (1) Surprise, which ordinary prudence could not have guarded against; (2) that the evidence is insufficient to justify the decision; (3) that the decision is against the law; and (4) errors in law occurring at the trial and excepted to by the moving party. The last three grounds were based upon the minutes of the court. The first ground was supported by a declaration of the deputy city attorney, Mr. Oberholzer, substantially as follows: that the trial was held on December 12, 1973; that the pleadings did not allege defendants were violating any franchise requirements of the city charter; that no evidence was admitted during the course of the trial and no accusation was made of such violation of the city charter during the trial; that the issue of whether the franchise requirement was violated was not presented to the court by the plaintiffs until final written argument, after all the parties had rested their cases; that had defendants been aware the franchise requirement was going to be put in issue and used as a basis for the court's judgment, evidence could have been produced to show that ambulance operators in the city do not fall within the provisions of the franchise requirement of the city charter; that defendants were surprised by the challenge relating to the franchise requirements of the city charter and could not have reasonably expected such a challenge.

The motion for new trial was impressively presented and argued by appellants' counsel before the trial court with reference to supporting and substantial authorities. Among other things he referred to respondent Solomon's calculated concealment of the franchise issue by reference to a portion of the reporter's transcript as follows:

"THE COURT: Now, just a minute now . . . Let's talk about the plaintiff, Subriar, then. Is there an issue here as to whether this has been—has this been argued out? Has he exhausted his remedies?

"MR. SOLOMON: There is an issue as to that. We contend we have fulfilled them insofar as we are legally required to. I have a very extensive trial brief, your Honor, which I —

"MR. OBERHOLZER: May we see it?

"MR. SOLOMON: No, no. I would have loved to have filed it in advance, *but there's a particular point involved in this case which I don't want to tip my hand on,* and that is the only reason I am holding up on filing my trial brief until after the matter has been

submitted. But I have cited extensive authorities which we believe will take care of the standing and exhaustion of administrative remedies point. But as to this particular point, evidence point, I don't believe we have to deal with that because I am offering evidence in behalf of the plaintiff." (Italics added.)

I. ▇ DID THE TRIAL COURT LACK JURISDICTION TO HEAR THE COMPLAINT OF PLAINTIFF-RESPONDENT FRANK W. SUBRIAR BECAUSE HE FAILED TO EXHAUST HIS ADMINISTRATIVE REMEDIES?

In a manner prohibited by the Rules of Court (rule 232(e)), the trial court made a finding that the allegations of 11 enumerated paragraphs of Subriar's first cause of action, including paragraph number 9, were true. Paragraph 9 of the first amended complaint, in language apparently designed to obfuscate, alleges that: "Prior to the date of the alleged criminal offense, plaintiff submitted an application to the City of Bakersfield for issuance to plaintiff of a certificate of public convenience and necessity but said City refused to proceed with the hearing and granting of such certificate absent determination on its part that the 'public convenience and *necessity* required' the granting of such certificate . . . ."

The trial court erred in making such finding contrary to the prescribed Rules of Court. When opposing counsel objected to the proposed findings because they violated rule 232(e) which provides, among other things: "Findings shall not refer merely to the truth or falsity of allegations contained in the pleadings," the trial court either brushed aside or ignored the objections and made a finding that: "The allegations of Paragraphs 1, 2, 4, 5, 6, 7, 8, 9, 10, 11 and 12 of the first cause of action of the first amended complaint are true."[8] *Martin* v. *Baker* (1974) 43 Cal.App.3d 1049 [118 Cal.Rptr. 238], is a case in which, as in the instant case, the trial judge ignored appellants' objections that the proposed findings were prohibited by rule 232(e), and made findings in the manner prohibited by that rule. The court said: ". . . we find that the findings prepared by the respondents below and signed by the trial court are practically equivalent to no findings at all, which works a miscarriage of justice in that without the basis of the court's rulings on the issues being delineated, the losing party is unable to properly prepare a record

---

[8] In *Kadner* v. *Shields* (1971) 20 Cal.App.3d 251 [97 Cal.Rptr. 742], a case which arose before the adoption of rule 232(e), the court said: "This method of making findings, pursued by the Kadners and accepted by the trial court, although then not governed by the Rules of Court, is unsatisfactory." (20 Cal.App.3d at p. 274, fn. 32.)

on appeal to which he is entitled." (Italics added.) (43 Cal.App.3d at p. 1054.)

In addition to the objectionable finding above discussed, the trial court made two findings as follows:

"3. A certificate to operate an ambulance service within the City has twice been denied plaintiff, Frank Subriar, by reason of defendant City's conclusion that the ambulance service needs of City residents were being adequately served by the two existing operators certificated pursuant to Chapter 7.62 of the defendant City's Ordinance.

". . . . . . . . . . . . . . . . . . . . .

"5. It would be an entirely futile act and a complete waste of time and effort for plaintiff Frank Subriar to submit yet a third application to the City prior to rendition of any decision upon his challenge to the constitutionality of Subsection (f) of 7.62.060."

A careful reading of the entire record in this case, including the interrogatories and answers to interrogatories introduced into evidence at the trial, leads to the inescapable conclusion that the two quoted findings are not supported by any evidence whatsoever.

The undisputed facts show that in 1970 Subriar submitted his application and then at the hearing scheduled for the purpose of enabling him to make his showing of public convenience and necessity, Subriar announced that it was his position that he need not make such a showing and he refused to proceed any further. Because of this announced position, the hearing was terminated on all issues "without further consideration" and Subriar was so notified by a letter of July 3, 1970, from the city manager. Thus no decision was in fact made by the city manager, or even if it be deemed a decision, no final decision in fact was made by the "City," since Subriar took no appeal to the city council.

In 1972, Subriar again filed an application with the city manager but at the time scheduled for the hearing, the city manager received from Subriar's counsel (co-plaintiff Solomon) a letter of January 10, 1973, advising that neither he nor Subriar would attend the hearing and *requesting that it be cancelled.* Upon receipt of this letter the city manager wrote Solomon that at his, Solomon's request, the hearing for his client had been cancelled and that the city would consider it as a voluntary

abandonment of the application. No decision was rendered by the city manager because the application was considered abandoned. No appeal to the city council was taken.

It is thus clear from the evidence that the city manager was presented with no evidence in support of either application on the subject of "public convenience and necessity," and, of course, made no findings or conclusions that the city's residents were already being adequately served. And, since no appeal of any kind was taken to the city council in either case, the "City," (referring to the reviewing board, the city council) had heard no evidence, made no findings or decisions and had neither matter before it.

Obviously, under these circumstances when the court made its finding No. 5 quoted above, that it would be an entirely futile act and a complete waste of time and effort for plaintiff Frank Subriar to submit yet a *third application* to the city prior to rendition of any decision upon his challenge to the constitutionality of subdivision (f) of section 7.62.060, it made a finding completely unsubstantiated by the record.

It is therefore self-evident that Subriar not only failed to *exhaust* his administrative remedies by taking the required appeal to the city council, but he even failed to test his administrative remedies, by failing each time to permit his application to go to a decision by the city manager.

Respondent Subriar's position on this question is confined within one paragraph appearing in respondents' brief, as follows:

"Mr. Subriar as a twice 'terminated' applicant for a permit under said Chapter 7.62 likewise has standing to challenge the constitutional validity of subsections (a) and (f) of said Section 7.62.060. In that the defendant City and its employees have no real choice but to obey its own laws, *absent revision thereof,* it would have been and it would still be a wholly useless and futile act for Mr. Subriar to appeal to the Council its City Manager's termination of hearing on his applications in the light of Mr. Subriar's refusal to even attempt to comply with said subsections (a) and (f) because of his position that said subsections are unconstitutional. Our law does not require one to engage in a futile or useless act. Section 3532 of the Civil Code; [*Van*] *Gammeren* v. *City of Fresno* (1942) 51 Cal.App.2d 235, 124 P.2d 621 (city statute prohibiting sale of milk within city if processed outside of city held unconstitutional and county milk processor-seller held to have standing to sue without exhausting adminis-

trative remedies); *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1 [95 Cal.Rptr. 329] (held when administrative remedy is clearly inadequate, exhaustion thereof is not a condition precedent to standing to sue)."

*Van Gammeren* was a case readily distinguishable from the case before the court. It involved an ordinance of the City of Fresno which prohibited the sale of pasteurized milk inside the city unless it had been pasteurized within the city. Respondent operated milk pasteurizing plants located outside the city limits and sued to attack the constitutionality of the ordinance. Since there was no way the city could have granted him permits to deliver within the city under the very terms of its own ordinance (because his pasteurizing plants were outside the city), the court held it would have been a useless act for the respondent manufacturer to have applied for a permit and gone through the motions of administrative review, and therefore such steps were not a condition of respondent bringing the court action to test the constitutionality of the act. (See *McHugh* v. *County of Santa Cruz* (1973) 33 Cal.App.3d 533, 539 [109 Cal.Rptr. 149], distinguishing *Van Gammeren.*) In the case before the court there is nothing in the ordinance prohibiting the city from granting the certificate upon a showing of public convenience and necessity.

The case of *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], relied upon by respondents, is also readily distinguishable from the case before the court. *Sail'er Inn* involved a state statute prohibiting female bartenders. The petitioners were holders of on-sale liquor licenses who claimed they would be in violation of the 1964 federal Civil Rights Act if they failed to hire female bartenders, but would violate the state law and lose their liquor licenses if they did hire females. The state Supreme Court found that the petitioners were "placed in the untenable situation of having to choose whether to obey possibly conflicting federal and state laws and face a penalty under the one they choose to disobey." The court then said: "In light of these extraordinary circumstances, it would be improper to require them to exhaust their administrative remedies." (*Id.,* at p. 7.)

In *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280, 301 [109 P.2d 942, 132 A.L.R. 715], the court held that simply because a petitioner alleged that an administrative body had decided cases on similar facts against his position, did not make an administrative appeal futile and did not excuse a litigant from exhausting his administrative remedies.

■ The mere fact that a statute is challenged on constitutional grounds does not excuse a failure to exhaust administrative remedies. (*People* v. *Coit Ranch, Inc.* (1962) 204 Cal.App.2d 52, 56-58 [21 Cal.Rptr. 875].) Likewise, the requirement of exhausting administrative remedies applies to a class action raising constitutional issues.

In *Walker* v. *Munro* (1960) 178 Cal.App.2d 67 [2 Cal.Rptr. 737], a case in which a declaratory relief action was brought to challenge the constitutionality of certain sections of the Alcoholic Beverage Control Act during the pendency of the administrative proceedings involving alleged violations of the act, the court held that a litigant may not challenge the constitutionality of a statute under which an administrative agency functions unless he has first raised the constitutional issue before the administrative agency.

In *State of California* v. *Superior Court* (1974) 12 Cal.3d 237 [115 Cal.Rptr. 497, 524 P.2d 1281], while holding that an action for declaratory relief is not appropriate to review an administrative decision, the court rejected the holding in *Walker* that the review court could not consider the constitutionality of the statute in question unless it had been raised in the administrative proceeding.[9] The court stated: "However, a year after *Walker* was decided, in *Flores* v. *Los Angeles Turf Club* (1961) 55 Cal.2d 736 [13 Cal.Rptr. 201, 361 P.2d 921], this court considered the constitutionality of the statute there in question, requiring only that the litigant exhaust his administrative remedies as to other issues involved in the case." (*State of California* v. *Superior Court, supra,* 12 Cal.3d at p. 250.)

The court held that declaratory relief is available to challenge the constitutionality of an ordinance, citing *McCarthy* v. *City of Manhattan Beach* (1953) 41 Cal.2d 879, 882 [264 P.2d 932]; *Floresta, Inc.* v. *City Council* (1961) 190 Cal.App.2d 599, 612 [12 Cal.Rptr. 182]. The court also held: "However, insofar as the fourth cause of action seeks to challenge the application of the Act to Veta [petitioner] the Commission is correct that Veta is essentially seeking to review the validity of an administrative action and, as discussed above, such review is properly brought under

[9]"It would be heroic indeed to compel a party to appear before an administrative body to challenge its very existence and to expect a dispassionate hearing before its preponderantly lay membership on the constitutionality of the statute establishing its status and functions. We conclude that [petitioner] should be permitted to challenge the constitutionality of the Act in this proceeding even though it failed to make such a challenge before the Commission at the time it applied for a permit." (*State of California* v. *Superior Court, supra,* 12 Cal.3d at p. 251.)

the provisions of section 1094.5 of the Code of Civil Procedure rather than by means of declaratory relief." (*State of California* v. *Superior Court, supra,* 12 Cal.3d at p. 251.)

The case of *Ogo Associates* v. *City of Torrance* (1974) 37 Cal.App.3d 830 [112 Cal.Rptr. 761], cited by respondents in their oral arguments before this court, is readily distinguishable from the case before the court. In *Ogo* the evidence was overwhelming that the city council had adopted the rezoning specifically to stop appellant's project and thus appellants could positively state that the city council would not have granted them a variance. ■ No such evidence exists in this case, which would enable the respondents to positively say that the city council would not have granted Subriar a permit had he pursued his application. In fact, a certificate was granted to another applicant (Hall) between Subriar's first application and the filing of his second application.

In view of the foregoing authorities we conclude that where, as here, a plaintiff has submitted himself to the jurisdiction of the administrative agency by applying for a license or permit under the act, the validity of which he does not attack in its entirety, his proper method of attacking the constitutionality of a specific subdivision of the act he claims to be invalid is by judicial review under the provisions of Code of Civil Procedure section 1094.5, rather than by declaratory relief. Subriar was not attacking the very validity of the existence of the granting agency itself under the ordinance, but was challenging the constitutionality of the ordinance as it applied to his situation, and his proper method of attack is under Code of Civil Procedure section 1094.5. Subriar has failed to exhaust his administrative remedies. The court below erred in its conclusion that Subriar "insofar as required by law, has exhausted such administrative remedies as have been pragmatically available to him" (whatever meaning is ascribed to the term "pragmatically available to him").

II. ■ Did the Trial Court Err in Applying the "Strict Scrutiny" Standard in Determining the Constitutionality of Subdivision (f) of Section 7.62.060 of the Municipal Code of the City of Bakersfield?

Gabriel W. Solomon, plaintiff in the second cause of action set forth in the first amended complaint, as a private citizen and taxpayer has attacked the constitutionality of subdivision (f) of section 7.62.060 of the

ordinance by an action in declaratory relief and for an injunction, under section 526a of the Code of Civil Procedure. The constitutional question may be properly reached by an action for declaratory relief such as was filed herein. (*State of California* v. *Superior Court, supra,* 12 Cal.3d 237.) It, therefore, becomes necessary for this court to consider the constitutional issue so raised, notwithstanding any jurisdictional defect which might be present in plaintiff Subriar's first cause of action because of his failure to exhaust his administrative remedies.

The trial court considered that the right to operate an ambulance service in the City of Bakersfield was a "fundamental right." This appears clearly from the findings of the court, viz:

"[Finding No.] 8. Subsection (f) of said Chapter [*sic*] 7.62.060 as thus interpreted and enforced by defendant City, arbitrarily and capriciously deprives plaintiff Frank Subriar of his *fundamental right* to engage in the entirely lawful and publically [*sic*] useful business of conducting an ambulance service within defendant City." (Italics added.)

"[Conclusion No.] 4. Subsection (f) of said Chapter [*sic*] 7.62.060 is so uncertain and vague as to deprive plaintiff Frank Subriar of the *right* he would otherwise have to conduct a lawful business and said subsection is therefore unconstitutional and void." (Italics added.)

It is also clear from finding No. 9 that the trial court placed the burden of proving the validity of its ordinance upon the city:

"[Finding No.] 9. No evidence has been adduced to establish in any degree that the public's interest in safe, efficient, economical and otherwise adequate ambulance services is protected, promoted or served by said subsection (f) of Chapter [*sic*] 7.62.060."

Respondents incorporated in respondents' brief filed herein, a true copy of "Plaintiffs' Trial Brief," and in the latter respondents acknowledge certain facts clearly to be substantiated by the evidence (including stipulations, interrogatories and answers to interrogatories) as follows:

"Prior to November 13, 1961, there were no laws nor regulations in effect which regulated the conduct of ambulance services, as such, within the City of Bakersfield. In this wholly unregulated pre-1961 atmosphere, ambulance services available to City residents were often unsafe, unsanitary, and otherwise inadequate. The ability of responsible ambu-

lance service operators to operate safe, sanitary, dependable and otherwise adequate ambulance service was unfairly impaired by unprincipled, irresponsible and wholly unregulated competitors. Accordingly, it was apparent that a need existed for enactment of a regulatory ordinance. Accordingly, on November 13, 1961 the City enacted an ambulance industry regulatory ordinance in the form of Chapter 7.62 . . . .

"The State of California did not legislatively enter the field of ambulance industry regulation until 1968. In that year the State legislature enacted Sections 2510-2512 of the Vehicle Code relative to licensing of ambulance operators. Insofar as is here relevant, Section 2512 provided that:

> " 'The Commissioner (of the California Highway Patrol) after consultation with and pursuant to the recommendations of the State Department of Health and the Department of Motor Vehicles, shall adopt and enforce such reasonable regulations as he determines are necessary for the public health and safety regarding the operation, equipment and certification of drivers of all ambulances used for emergency services. . . .

> " 'This Section shall not preclude the adoption of more restrictive regulations by local authorities, . . .'

"Pursuant to said Section 2512, the State Highway Patrol Commissioner has adopted and does enforce a rather comprehensive and wide array of regulations governing the licensing, equipment, sanitation, insurance and operation of all ambulances, drivers and attendants engaged in the rendition of emergency ambulance services. These regulatory provisions of the State are set forth in Subchapter 5 of Chapter 2 of Title 13 of the California Administrative Code. . . .

". . . . [F]or several years Mr. Subriar, pursuant to licenses and certificates issued by the State Highway Patrol, the Department of Motor Vehicles and [the California Department of Health Care Services]. . . has been engaged in the operation of three different ambulance services within the County of Kern. These services have been and are now operated by Mr. Subriar under the firm name of 'DELANO AMBULANCE SERVICE', located at 419 Main Street, Delano, California; 'LAMONT AMBULANCE SERVICE', located at 9417 Main Street, Lamont, California; and 'JERRY'S AMBULANCE SERVICE', located

at 3011 Niles Street, Bakersfield, California. In addition, both the County of Kern and the California Department of Health Care Services have over the past several years been awarding contracts and certifications to Mr. Subriar to provide ambulance services to indigents, and so-called State Medi-Cal and Federal MediCare eligibles throughout Kern County."

In the same brief respondents also assert: "There is therefore no issue whatsoever in this litigation as to the right, power and/or duty of the City to enact and to *equally* enforce upon all ambulance business operators *reasonable* rules as to the conduct of their ambulance services. What is disputed and at issue in this case is solely and only the assertion and claim of the defendant City that it has lawfully enacted and lawfully enforces a statute giving it the power to vest an ambulance business monopoly in one or more persons (e.g. Messrs. Flinn and Hall) and that it has the power under said enactment to exclude all other persons from engaging in such business unless it decides that the public necessity and convenience requires that another ambulance service be permitted to operate within the City. In short, the issue here is not whether the City has the right or power to *equally and even handedly* regulate *all* ambulance services within the City. . . ."

To the contrary, respondents contend the issue is whether the city has the right to grant a city ambulance business monopoly to certain persons and exclude all other persons from conducting an ambulance business within the city.

That the respondents contend the right to operate an ambulance business in the City of Bakersfield is a *fundamental right* appears clear from this excerpt from respondents' brief: ". . . no California court has yet held nor suggested that government may deprive a person of his otherwise *constitutionally-protected right to conduct a lawful business* solely upon the basis of arbitrary and evidentially unsupported conjecture and speculation. The measure of the validity of a statute is supposed to be a benefit to be derived therefrom by the public at large. Here the City's denial of an ambulance certificate on the basis of asserted absence of 'public convenience and necessity' operates to the demonstrable benefit of no one except Messrs. Flinn and Hall. That purely private benefit cannot serve as justification for denial of Mr. Subriar's *otherwise constitutionally-protected right to conduct a lawful business.*" (Italics added.)

Respondents support the concept of a fundamental right by citing *Purdy & Fitzpatrick v. State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194], a case which held invalid California's Labor Code provisions prohibiting the employment of aliens on public works, and which case footnoted (71 Cal.2d at p. 585, fn. 46) that *Takahashi* v. *Fish Comm'n* (1948) 334 U.S. 410 [92 L.Ed. 1478, 68 S.Ct. 1138], was an extension of the holding in *Truax* v. *Raich* (1915) 239 U.S. 33 [60 L.Ed. 131, 36 S.Ct. 7]. The latter case found "fundamental" the right to work for a living in the common occupations of the community. Upon such authority respondents conclude that the ordinance "must be tested by a strict standard of scrutiny and analysis which imposes a burden of proof upon the city to establish that some compelling public interest necessitates such interference with his right to pursue his otherwise lawful occupation as an ambulance operator."

It is further the position of the respondents that, as written, subdivision (f) of section 7.62.060 goes beyond the power to regulate and vests in the hands of the city manager and the city council the right to arbitrarily exclude or prohibit the applicant from procuring a permit, since the ordinance creates no criteria for determination of what constitutes "public convenience and necessity." And, respondents further argue, the term "public convenience and necessity" is variable and relative, (citing *San Diego etc. Ferry Co.* v. *Railroad Com.* (1930) 210 Cal. 504 [292 P. 640]), and since the city manager and the city council are "possessed of no pertinent special competence whatsoever as to the ambulance service business," the "public convenience and necessity standard should be held impermissibly vague."

*Luxor Cab Co.* v. *Cahill* (1971) 21 Cal.App.3d 551 [98 Cal.Rptr. 576] involves provisions of the Municipal Code of San Francisco which required a showing of public convenience and necessity before the issuance of permits or licenses to operate taxi cabs on the streets of San Francisco.[10] Answering the contention that the issuance of new certificates infringed on the vested rights of present certificate holders the court said: "The use of streets by taxicabs is a privilege that may be granted or withheld without violating either due process or equal protection. This privilege may be granted exclusively or nonexclusively to render public

---

[10]"1075. No license or permit shall be issued for the operation of any motor vehicle engaged in the business of or used for transporting passengers for hire, unless and until the Police Commission shall by resolution declare that *public convenience and necessity* require the proposed motor vehicle for hire service for which application for a license or permit is made." (San Francisco Mun. Code, § 1075.) (Italics added.)

services (*In re Petersen,* 51 Cal.2d 177, 182-183 [331 P.2d 24]).'' (*Luxor Cab Co.* v. *Cahill, supra,* 21 Cal.App.3d at p. 558.)

In *People* v. *Ryser* (1974) 40 Cal.App.3d 1 [114 Cal.Rptr. 668], the court said: ''Before deciding whether or not a statute violates the equal protection clauses of the federal and state Constitutions, a court must determine the proper standard for reviewing any classifications which the statute creates.'' (*Id.,* at p. 6.)

In *D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1 [112 Cal.Rptr. 786, 520 P.2d 10], which was decided after the decision of the United States Supreme Court in *San Antonio School District* v. *Rodriguez* (1973) 411 U.S. 1 [36 L.Ed.2d 16, 93 S.Ct. 1278], the California Supreme Court enunciated clearly and distinctly the law of this state as follows: ''We inquire at the outset whether the trial court employed the proper test in reviewing the legislative classification in question under the equal protection clause. There are two such tests which are applied by the court of this state and the United States Supreme Court. The first is the basic and conventional standard for reviewing economic and social welfare legislation in which there is a 'discrimination' or differentiation of treatment between classes or individuals. It manifests restraint by the judiciary in relation to the discretionary act of a co-equal branch of government; in so doing it invests legislation involving such differentiated treatment with a presumption of constitutionality and 'requir[es] merely that distinctions drawn by a challenged statute bear some rational relationship to a conceivable legitimate state purpose.' (*Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784 [87 Cal.Rptr. 839, 471 P.2d 487].) 'So long as such a classification ''does not permit one to exercise the privilege while refusing it to another of like qualifications, under like conditions and circumstances, it is unobjectionable upon this ground.'' (*Watson* v. *Division of Motor Vehicles* (1931) 212 Cal. 279, 284 [298 P. 481]; see also *Blumenthal* v. *Board of Medical Examiners, supra,* 57 Cal.2d 228, 233 [18 Cal.Rptr. 501, 368 P.2d 101].)' (*Whittaker* v. *Superior Court* (1968) 68. Cal.2d 357, 367-368 [66 Cal.Rptr. 710, 438 P.2d 358].) Moreover, the burden of demonstrating the invalidity of a classification under this standard rests squarely upon *the party who assails it.* [Citations.]

''A more stringent test is applied, however, in cases involving 'suspect classifications' or touching on 'fundamental interests.' Here the courts adopt 'an attitude of active and critical analysis, subjecting the classification to strict scrutiny. (See *Shapiro* v. *Thompson, supra,* 394 U.S. 618, 638 [22 L.Ed.2d 600, 617, 89 S.Ct. 1322]; *Sherbert* v. *Verner* (1963) 374 U.S.

398, 406 [10 L.Ed.2d 965, 971-972, 83 S.Ct. 1790]; *Skinner* v. *Oklahoma, supra,* 316 U.S. 535, 541 [86 L.Ed., 1655, 1660, 62 S.Ct. 1110]; see also *Developments in the Law—Equal Protection* (1969) 82 Harv.L.Rev. 1065, 1120-1131, [1087-1131].) Under the strict standard applied in such cases, *the state* bears the burden of establishing not only that it has a *compelling* interest which justifies the law but that the distinctions drawn by the law are *necessary* to further its purpose.' (*Westbrook* v. *Mihaly, supra,* 2 Cal.3d at pp. 784-785.) (Some italics added.)

"The conventional 'rational relationship' test is traditionally applied in cases involving occupational licensing, including those concerning the practice of the healing arts. [Citations.] Nevertheless, in certain cases involving occupational regulation the more stringent 'strict scrutiny' test has been employed. [Citations, including *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], and *Purdy & Fitzpatrick* v. *State of California* (1969) 71 Cal.2d 566 [79 Cal.Rptr. 77, 456 P.2d 645, 38 A.L.R.3d 1194].] Those cases, however, have invariably involved a classification drawn along lines which rendered it 'suspect' in constitutional terms—such as national origin or alienage (*Griffiths, Raffaelli,* and *Purdy & Fitzpatrick*) or sex (*Sail'er Inn*). In the instant case, on the other hand, the statutory classification is based upon the type of medical degree possessed by those who would be licensed as physicians and surgeons—which in turn depends upon the type and content of education manifested by the conferral of such degrees. Nor can it be said that the instant case touches upon 'fundamental interests' as that term has lately been defined by the United States Supreme Court, for the right to be admitted to a certain profession is not a right 'explicitly or implicitly guaranteed by the Constitution.' (*San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1, 33-34 [36 L.Ed.2d 16, 43, 93 S.Ct. 1278].)" (*D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d at pp. 16-18.)

Respondents place great reliance upon the case of *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1, a case involving discrimination against women in the field of bartending. Respondents' position is shown to be manifestly untenable in the following language from *D'Amico:* "Plaintiffs rely heavily on the decision of this court in *Sail'er Inn, Inc.* v. *Kirby, supra,* 5 Cal.3d 1. It is true that in that case we employed rather broad language in describing why the 'strict scrutiny' standard was applicable —including language which might be fairly read to indicate that the statute in question touched upon a 'fundamental interest' within the meaning of the above-discussed cases insofar as it limited the right of a

class of persons to pursue a lawful profession. We do not believe, however, that that language compels the application of the more stringent standard of review to this case. Three independent reasons support our belief. First, the fundamental thrust of *Sail'er Inn* is against discrimination on the basis of sex, a classification which is clearly 'suspect' and therefore subject on that basis to review under the 'strict scrutiny' test. Second, to the extent that *Sail'er Inn* may be interpreted to find a cognizable 'fundamental interest' in the right to pursue employment, it is clearly limited in scope to 'the common occupations of the community' and should not be applied to professions whose technical complexity and intimate relationship to the public interest and welfare counsel greater deference to the legislative judgment. Third, and perhaps most significant from the point of view of legal precedent, *Sail'er Inn* was decided prior to the case of *San Antonio School District* v. *Rodriguez, supra,* 411 U.S. 1; the latter case, as we have indicated above, establishes that 'fundamental interests' for the purpose of equal protection review are limited to rights which are 'explicitly or implicitly guaranteed by the Constitution.' (411 U.S. at pp. 33-34, [36 L.Ed.2d at pp. 43-44].) No such interest or right is involved in the instant case." (*D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1, at p. 18.)

From the evidence in this case it is clear that the operation of an ambulance service on the city streets is a business or profession "whose technical complexity and intimate relationship to the public interest and welfare counsel greater deference to the legislative judgment." (*D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d at p. 18.) It is not one of the common occupations of the community as that term is referred to in *San Antonio School District,* and therefore not one of the "fundamental rights" or "fundamental interests" guaranteed explicitly or implicitly by the Constitution.

We therefore conclude that the trial court employed the wrong equal protection standard when it applied the "strict scrutiny" standard to the classification here involved and thereby placed the burden of proof upon the appellant city. The conventional standard should have been used and the burden was upon respondents, the parties who assailed the constitutionality of the ordinance.

The strict standard being inapplicable, we need only determine whether there is any rational relationship between the statute and some legitimate state objective. Under this test, the city council "is presumed to have acted constitutionally, and statutory classifications may be set

aside only if no ground can be conceived to justify them." (*Adams* v. *Superior Court* (1974) 12 Cal.3d 55, 62 [115 Cal.Rptr. 247, 524 P.2d 375].) That the purpose of the ordinance is the protection of the public is not only reasonably clear, but also conceded by respondents.

This error, in applying the wrong standard, however, does not compel reversal of the judgment. (*D'Amico* v. *Board of Medical Examiners, supra,* 11 Cal.3d 1, p. 18.) "The fact that the action of the court may have been based upon an erroneous theory of the case, or upon an improper or unsound course of reasoning, cannot determine the question of its propriety. ■ No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey* v. *Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

Accordingly, we now turn to a consideration and determination of whether the trial court's conclusions and decision were nevertheless correct.

III. ■ WAS THE ORDINANCE INVALID BECAUSE IT ESTABLISHED NO STANDARDS OR CRITERIA FOR THE DETERMINATION OF WHAT CONSTITUTES "PUBLIC CONVENIENCE AND NECESSITY"?

Nowhere in the ordinance is the phrase "public convenience and necessity" defined, nor is there any set of standards or criteria set forth for determination of the "public convenience and necessity" referred to in subdivision (f) of section 7.62.060.

*Luxor* provides a case law definition of public convenience and necessity as follows: "Public convenience and necessity has been defined as a public matter, without which the public is inconvenienced to the extent of being handicapped in the practice of business or wholesome pleasure or both, and without which the people of the community are denied, to their detriment, that which is enjoyed by others similarly situated. Public necessity does not mean *indispensable* to the public but an urgency less pressing (*San Diego etc. Ferry Co.* v. *Railroad Com.,* 210 Cal. 504, 511 [292 P. 640])." (*Luxor Cab Co.* v. *Cahill, supra,* 21 Cal.App.3d at pp. 557-558.)

In the case before the court the appellants defined "public convenience and necessity" as they understood it in answering respondents' interrogatory No. 11 (first set) as follows: "(a) The term 'public convenience and necessity' refers to that condition whereby the citizens of the City of Bakersfield would profit from an additional ambulance service. Any improvement in ambulance service that is highly important to the public convenience and desirable for the public health, welfare and safety, may be regarded as a necessity. Public convenience and necessity connotes both indispensability and needfulness, embracing both the present and what is expected in the future."

Respondents' interrogatory No. 11 (first set) also asked the following:

"11. As to the purported requirement of a showing of 'public necessity and convenience' as used by you in Chapter 7.62 set forth:

". . . . . . . . . . . . . . . .

"(b) A description of the type, nature, quantity and quality of evidence which would satisfy you of the existence of the required 'public convenience and necessity.' "

Appellants answered this interrogatory in the following manner: "Evidence to support a finding of the existence of the public convenience and necessity 'requiring another ambulance service' includes, but is not limited to a consideration of the need for service, the ability of the prospective operator to perform the service, the quality and quantity of existing service, the possible effect of multiple service, the growth and development of the area to be served, the scope of service afforded by the applicant, more reliable equipment, more efficient service to passengers, and inability of present carriers to handle the need for service."

In *In re Petersen* (1958) 51 Cal.2d 177 [331 P.2d 24], the court held valid an ordinance granting the chief of police the right to designate the stands on public streets to be used by taxi cabs, if the written consent of the person who occupied the ground floor of the building fronting the proposed stand was first obtained. The court said: "Ordinances are presumed to be valid, and no provision of the challenged ordinance may be condemned as an improper exercise of the police power if any rational ground exists for its enactment." (*Id.,* at p. 182.)

Answering the contention that the ordinance was invalid because it contained no specific or express standards by which to confer or deny such permits, the court said:

"The granting of discretionary power, not restricted by specific standards, to confer or deny licenses or permits has been upheld in a variety of situations where the licensed activity, because of its dangerous or objectionable character, might be regulated or restricted to certain localities. [Citations.] . . .

"The absence of express standards in such situations does not mean that the licensing agency may act arbitrarily or oppressively; it is presumed that the agency will duly perform its public duty, but an abuse may be shown and relief obtained in the courts. [Citations.] . . .

"Moreover, standards for administrative action can sometimes be found by implication. In *Rescue Army* v. *Municipal Court,* 28 Cal.2d 460, 471 [171 P.2d 8], where an ordinance requiring a permit was involved, we held that sufficient standards were inherent in the reasons which must have led to the adoption of the ordinance." (*In re Petersen, supra,* 51 Cal.2d at pp. 184-185.)

In *Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749 [22 Cal.Rptr. 14, 371 P.2d 758], the court pointed out that while it is the general rule that where a discretionary power is delegated to an administrative body, the statute must contain some "ascertainable standard" to serve as a guide, ". . . the Legislature need not lay down minutely defined standards and that sufficient standards for administrative action *may be found by implication from the general purposes of a statute and from the reasons which must have led to its adoption.*" (Citing *In re Petersen, supra*). (*Louis Stores, Inc.* v. *Department of Alcoholic Beverage Control, supra,* 57 Cal.2d at p. 760.) (Italics added.)

"The granting of discretionary power, not restricted by specific standards, to confer or deny licenses or permits has been upheld in a variety of situations, particularly where the licensed activity is dangerous or objectionable." (*Savelli* v. *Board of Medical Examiners* (1964) 229 Cal.App.2d 124, 141 [40 Cal.Rptr. 171].)

■ "Delegation of power to a municipal officer to refuse permits to businesses which are subject to police regulation is constitutional, and it

is presumed that such authorities have not acted arbitrarily but in the exercise of sound discretion. [Citations.] The granting of discretionary power not restricted by specific standards to confer or deny licenses is to be upheld where the licensed activity, because of its potentially objectionable character (e.g., traffic obstruction), may be regulated or restricted to certain localities." (*San Francisco Street Artists Guild* v. *Scott* (1974) 37 Cal.App.3d 667, 674 [112 Cal.Rptr. 502].) (To the same effect see *Hope* v. *Contractors' etc. Bd.* (1964) 228 Cal.App.2d 414 [39 Cal.Rptr. 514]; *Iscoff* v. *Police Commission* (1963) 222 Cal.App.2d 395 [35 Cal.Rptr. 189].)

As indicated in *Petersen,* it is *presumed that the agency will duly perform its public duty.* ■ In the present case the evidence clearly establishes the deplorable condition which existed before the enactment of the ordinance, and the obvious reasons for its enactment. Sufficient standards are inherent in the reasons leading to the adoption of the ordinance. This purpose supplies standards which the city manager must observe in granting or denying the permits. "It is difficult to see how, as a practical matter, any additional standards could be set forth which would promote the objective of the ordinance, and nothing would be accomplished by requiring that the standards which are implied must be made express." (*In re Petersen, supra,* 51 Cal.2d at p. 186.)

It is not to be assumed that the council or manager, in exercising the dispensing power, will act arbitrarily, or otherwise than in the exercise of sound discretion. (*Iscoff* v. *Police Commission, supra,* 222 Cal.App.2d at p. 404.) There is no justification for concluding upon the record before us that applications for permits, upon proper showing of public convenience and necessity would be denied by the city manager arbitrarily, or that the city council would arbitrarily sustain denial of all such permits as indicated by respondents. Appellants' record of performance indicates to the contrary. Its first applicant, Flinn, was granted such certificate; its second applicant, Mish, was denied a certificate "because no convenience or necessity was shown", appealed, and abandoned its appeal to the city council on October 24, 1966; its third applicant, respondent Subriar, abandoned his first application; its fourth applicant, Jaggers, withdrew his application which was filed on November 1, 1970; its fifth applicant, Hall, was granted a certificate on May 12, 1971; its sixth applicant, respondent Subriar, cancelled and withdrew his second

application.[11] In other words, no applicant was denied a certificate and had such denial sustained by the city council.

We find, therefore, that respondents failed to prove in this case: that the right to operate an ambulance business on the streets of the City of Bakersfield is a "fundamental right" given explicitly or implicitly by the Constitution; they failed to prove in this case that the classification or differentiation failed to bear some rational relationship to a legitimate state purpose, and in fact, admitted that the facts dictated regulation of such business by the city; they failed to prove that in its application the ordinance would have been applied to them by the city manager or the council in an arbitrary or discriminatory manner, or that the city manager or city council would apply standards which were unreasonable. In short, respondents failed to produce any proof that the ordinance, as applied to either of them, violated either the due process clauses or the equal protection clauses of the state and federal Constitutions.

IV. ■ DOES THE ORDINANCE IN QUESTION VIOLATE THE SUPREMACY CLAUSE OF THE UNITED STATES CONSTITUTION?

Respondents cite for their authority 11 Cal.Jur.2d, Constitutional Law section 11, pages 306-307, which recites that article VI, section 2 of the United States Constitution and article I, section 3 of the California Constitution recognize that the United States Constitution and all laws made in pursuance thereof shall be the supreme law of the land. Respondents then refer to section 1802 of title XVIII of the federal Medicare Act, and contend that since "the County of Kern, State of California, and the U.S. Department of Health, Education and Welfare have approved and authorized Mr. Subriar to provide ambulance services within the City for indigents and for Medi-Care [*sic*] and Medi-Cal eligibles, the City of Bakersfield cannot, consistent with said Section 1802, prohibit Mr. Subriar from rendering such services nor vest a monopoly thereto in Messrs. Flinn and Hall."

Title XVIII, section 1802 of the federal Medicare Act (42 U.S.C. § 1395a) provides that: "Any individual entitled to insurance benefits under this subchapter may obtain health services from any institution, agency, or person qualified to participate under this subchapter if such institution, agency, or person undertakes to provide him such services."

---

[11]This data was supplied by appellants in response to interrogatory No. 13 of respondents' first set of interrogatories.

There is no evidence in the record itself which demonstrates that Mr. Subriar was either authorized by HEW itself to provide ambulance services for Medi-Cal or Medicare eligibles, or that he was authorized by HEW to provide such services in the City of Bakersfield. The record only refers to licenses from the state Department of Highways, Highway Patrol Commissioner, and the state Department of Health, the latter for providing Medi-Cal and Medicare services.

Moreover, the lower court made no findings or conclusions regarding a conflict between section 7.62.060, subdivision (f), and the federal act. When respondents made a proposed conclusion on the subject, the appellant objected on the grounds no evidence had been presented at trial upon which such a conclusion could be based.

Aside from the above noted failure of proof, the federal statute does not appear to preclude local regulation such as involved in this case. First, section 1801 of the federal act (42 U.S.C. § 1395) stated that: "Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided, or over the selection, tenure, or compensation of any officer or employee of any institution, agency, or person providing health services; or to exercise any supervision or control over the administration or operation of any such institution, agency, or person."

· The clear implication of this section is that the states are to retain all licensing authority. Moreover, in defining hospitals and many other health care services the act includes in the definitions that the hospitals or services be licensed or approved by the state or locality responsible for licensing or approving hospitals (e.g., 42 U.S.C. § 1395x (e) (7); (s) (10)). Although no express licensing requirement appears in the definition of ambulance service (42 U.S.C. § 1395x (s) (7)), the clear implication under section 1801 (42 U.S.C. § 1395) is that local or state licensing laws control such services as well. Respondent's argument is without merit, finding its greatest substance in the pomposity of the term "federal supremacy."

V. ■ DOES CHAPTER 7.62 VIOLATE THE CITY'S OWN CHARTER BY GRANTING A FRANCHISE IN VIOLATION OF THE CITY CHARTER?

Respondents contend that the legal effect of defendant's chapter 7.62 ambulance ordinance and the certificates of convenience and necessity issued thereunder has been to unlawfully grant a city ambulance

*franchise* to Messrs. Flinn and Hall. Respondents cite several portions of the city charter which were then in effect when chapter 7.62 was adopted by the city council in 1961, to-wit:

"ARTICLE VIII

"PUBLIC UTILITIES

"No franchise shall be granted by the Council unless as otherwise specifically provided in this Charter. . . ." (§ 115.)

"No person, firm or corporation shall ever exercise any franchise. . . in, upon, over, under or along any street, highway or other public property in the City, unless a grant therefore shall have been obtained in accordance with the provisions of this Article . . ." (§ 116.)

". . . an applicant for a franchise shall file with the Council written application therefore, which must state the character and purpose of the franchise applied for; . . . , but no action shall be taken upon any such application . . . until 30 days after the same has been filed. If within that time a petition is filed and signed by the electors of the City, equal to (25%) of the entire vote cast at the last municipal election . . . praying that the granting of said franchise be referred to a vote of the electors of the City, said application shall be so referred." (§ 117.)

". . . an applicant for a franchise mentioned in the foregoing section, shall publish a notice of said application at least once in the official newspaper of the City within one week from the date of filing of said application. After . . . 30 days time from the date of filing of the application for said franchise, if no petition has been filed and signed by the required number of electors, . . . the Council shall cause to be published a notice in the official newspaper of the City stating the time prior to which, the place where, and the persons to whom sealed bids for such franchise may be delivered and the time and place the same will be publically [*sic*] opened, examined and declared and that an ordinance will be adopted by the Council awarding the franchise to the bidder offering to pay to the City, during the life of the franchise, the highest percentage of the gross annual receipts received from the use, operation or possession of the franchise. . . ." (§ 118.)[12]

---

[12]Respondents also cite sections 119-130 of appellants' charter, relating to franchise bidding procedure, and relating to requirements as to franchise bidder deposits, bonds, operations, bookkeeping, etc. In 1964 the charter was amended.

It is not in dispute that the procedure by which certificates have been issued thereunder does not conform to the above mentioned charter provisions.

It is the position of appellants that the certificates of convenience and necessity issued under the ordinance are permits or licenses and not franchises, and therefore compliance with the city charter provisions relating to the granting of franchises was not required. Respondents contend that the certificates issued are of such character that section 7.62.100 of the ordinance precludes suspension or revocation of any issued certificate absent proof of specified good cause; that section 7.62.060, subdivision (f), precludes issuance of any further certificates absent proof that "the public convenience and necessity requires" certification of any new competition, and that therefore, according to respondents, chapter 7.62 is a great deal more than a mere licensing or permit statute. The crux of respondents' position, as set forth in respondents' brief is stated as follows: "As a practical matter, it is obvious that for so long as any holder of a Chapter 7.62 certificate is adequately fulfilling the ambulance needs of the City's residents, Chapter 7.62 effectively protects that holder from any new business competition and thereby vests a practical monopoly in perpetuity in that certificate holder. This extended term or relatively permanent monopolistic characteristic of Chapter 7.62 certificates is one of the clearest indicia that grant of said certificates truly amounts to grant of a franchise."

If a franchise is granted, all applicable charter provisions and procedures must be complied with in order for the franchise to be valid. (22 Cal.Jur.2d, Franchises, § 15, p. 648.)

But, appellants contend that the certificates issued under the ordinance are mere licenses, or permits, nonexclusive in nature, since similar certificates may be issued to other qualified applicants who show that public convenience and necessity require the issuance of same; they are personal in nature, i.e., they are nonassignable; and they are of no fixed duration, but subject to the right of the city to eliminate them entirely by subsequent legislation. Such characteristics are the characteristics of a license or permit and not those of a franchise.

■ "A franchise is not a mere license or a privilege personal in nature. Licenses normally are in the nature of permits in the form of regulatory or tax measures imposed by a governing body on the pursuit of businesses or occupations of such a character as may have been

permitted at common law. On the other hand, franchises constitute special privileges that lie only in grant from the sovereign and do not exist at common law. The two categories are further differentiated in that a license is not regarded as property in the ordinary sense of the word, whereas a franchise is so regarded. . . . Moreover, a franchise is assignable, and is not revocable at the mere will of the grantor in the absence of a reservation of such a right." (22 Cal.Jur.2d, Franchises, § 3, pp. 629-630.)

"A franchise is property of an incorporeal and intangible nature, and is considered an estate in real property even when granted for a term of years. It is susceptible of private ownership, with all the rights attaching to the ownership of property in general. But a franchise is distinct from the property used in connection with it, since a transfer of such property does not effect a transfer of the franchise itself.

"As property, franchises are the subject of transfer and taxation, and are fully protected under both state and federal constitutions." (22 Cal.Jur.2d, Franchises, § 5, pp. 633-634.)

▇ Respondents rely upon *Macon Ambulance Serv., Inc.* v. *Snow Properties, Inc.* (1962) 218 Ga. 262 [127 S.E.2d 598], for the proposition that a municipal corporation cannot grant an exclusive franchise for the use of its streets to a private ambulance service business. In *Macon,* the city enacted an ordinance granting an *exclusive* five-year franchise to the Macon Ambulance Service, Inc. to transport by ambulance sick and injured persons within the City of Macon. The Supreme Court of Georgia upheld the holding of the trial court that: ". . . the City of Macon *was without charter power* to grant an exclusive franchise to the Macon Ambulance Service, Inc." (*Id.,* at p. 600.) (Italics added.) Notwithstanding that the charter did grant to the city the power by ordinance to make and establish " 'rules and regulations respecting public streets. . . motor vehicles . . . respecting all other matters and things affecting good government of said city as they shall deem requisite and proper for the security, welfare, health and convenience of said city and for the preservation of the peace and good order of the same' and further the charter power 'to regulate and control . . . motor buses and other common carriers for hire [and] motor vehicles.' " (*Id.*)

The granting of the *exclusive* right for a definite period of time falls within the commonly established definition of franchise and absent such authority in the charter, the city clearly was without power to grant such

franchise. The case therefore is authority in this area for the proposition that unless authorized by legislation or the city's charter, the power to grant exclusive franchises for the use of its streets for a specific period of time does not exist. No such set of facts exists in the case before the court.

There is no substantial evidence in the case before the court to support the conclusion of the trial court that "Subsection (f) of said Chapter 7.62.060 as interpreted and enforced by defendant City vests a franchise in existing certificated ambulance operators in violation of the Charter of defendant City. . . .", for the following reasons:

1. The permits granted are personal licenses, not property rights;

2. The permits granted are nonassignable;

3. The permits granted are not "exclusive privileges," because any other operator showing convenience and necessity and meeting the other requirements of the ordinance, can obtain a permit; therefore, the present holders of the permits have no assurance they will be the only operators;

4. The permits are not irrevocable. While it is true that the city has no provision for giving notice of revocation, the city council could simply repeal the ordinance any time it desires and allow all ambulance operators to enter the city, or adopt a new ordinance setting out different requirements;

5. No guarantee of any kind is given by the city to the permit holders.

In *Motor Transit Co.* v. *Railroad Commission* (1922) 189 Cal. 573, 580 [209 P. 586], the court held that the statute requiring a certificate of public convenience and necessity in order to operate a motor stage line over the public highways was a *regulatory measure.*

In *Copt-Air* v. *City of San Diego* (1971) 15 Cal.App.3d 984, 987 [93 Cal.Rptr. 649], the court said: "However, not every privilege conferred by government upon an individual or corporation achieves the dignity of a franchise." "While the courts have found it difficult to draw an exact line of demarcation between a franchise and a license, their general character and nature are well-defined, and there is a distinction. . . . A franchise . . . is neither personal nor temporary, and it is not revocable at

the mere will of the grantor, in the absence of a reservation of such right." (36 Am.Jur.2d, Franchises, § 2, p. 724.)

There is little to distinguish any difference between granting a license, or permission, to operate an ambulance business over the streets of a city and granting permission to operate a taxi cab. In *Luxor Cab Co.* v. *Cahill, supra*, 21 Cal.App.3d 551, old certificates of public convenience and necessity were reviewed, some cancelled and new ones issued, and all treated as licenses or permits, not franchises.

We conclude that there is no substantial evidence to support a determination that "[s]ubsection (f) of said Chapter 7.62.060 as interpreted and enforced by defendant City vests a franchise in existing certificated ambulance operators in violation of the Charter of defendant City and said subsection is therefore void and illegal." We further conclude that the proper conclusion to be drawn is that the certificates of public convenience and necessity issued by the city under subdivision (f) of section 7.62.060 are mere permits or licenses, and as interpreted by the appellants they do not preclude any other ambulance operator from making application and, upon proper showing of public convenience and necessity, receiving a like certificate or permit.

VI. DID THE TRIAL COURT ERR IN DENYING APPELLANTS' MOTION FOR NEW TRIAL ON THE FRANCHISE ISSUE UPON THE GROUNDS OF ACCIDENT OR SURPRISE?

It is true that neither cause of action in the amended complaint contained any allegations challenging the ordinance upon the grounds that as interpreted and enforced it created franchises rather than licenses or permits, in violation of the charter provisions. It is also true that no such contention was made at the trial. It is also true that plaintiff and counsel, Solomon, concealed his reliance upon this ground of challenge until the trial was over and he was required to file his written brief.

However, it is now well enough established as to require no citation of authority, that a declaratory relief complaint challenging the constitutionality of an ordinance need not plead specifics. The record supports appellants' contentions that they were indeed surprised. However, the contention raised did not call for any production of evidence, but for a legal conclusion from the facts already established, and appellants had an opportunity to answer respondents' contention by an answering brief.

The case is illustrative of the value of pretrial conferences. Had either counsel requested, or had the court on its own motion directed a pretrial conference, all parties would have become acquainted with all the issues to be raised and would have had an opportunity to prepare to meet them. We hold, therefore, that the trial court did not err in denying the motion for new trial on the ground of accident or surprise. For the reasons discussed hereinabove, however, it is clear that the motion for new trial on the statutory grounds of insufficiency of the evidence to justify the decision, and that the decision was against the law, was meritorious.

The judgment is reversed as to both causes of action.

Gargano, Acting P. J., and Franson, J., concurred.